*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-16847 |
| CONNOR J. | ) ) | Superior Court No. 3AN-17-02075 PR |
| | ) ) ) ) | O P I N I O N |
| | ) | No. 7345 – March 22, 2019 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Jr., Judge.

Appearances: Megan R. Webb, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Connor J. Laura Fox, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for State of Alaska.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

The superior court issued a 30-day involuntary commitment order after finding that the respondent was gravely disabled and there were no less restrictive alternatives to hospitalization. The respondent appeals, arguing that it was plain error to find he waived his statutory right to be present at the commitment hearing, that it was clear error to find there were no less restrictive alternatives, and that the commitment

order should be amended to omit a finding that he posed a danger to others, a finding the superior court meant to reject.

We conclude that it was not plain error to find that the respondent waived his presence at the hearing. We further conclude that it was not clear error to find that there were no less restrictive alternatives to a 30-day hospital commitment. However, because there is no dispute that the "danger to others" finding should not be included in the commitment order, we remand for issuance of a corrected order.

## II. FACTS AND PROCEEDINGS

### A. Petitions For Evaluation, 30-Day Commitment, And Medication

Connor J.[1] was living at Covenant House, an Anchorage shelter for homeless youth, when his psychiatric condition allegedly began to deteriorate. A social worker at Southcentral Foundation filed a petition in superior court seeking authority to hospitalize Connor for evaluation. The petition alleged that Connor was "exhibiting increasing[ly] more bizarre and disturbing behavior," that he was "hearing and responding to auditory hallucinations," and that he was exhibiting "persecutory delusions." It alleged that Connor believed he had "planned and carried out the '9/11' attacks," that the government was "monitoring him," and that staff were "out to get him." It noted that Connor had a history of suicidal thoughts; that he had been diagnosed at various times with depression, anxiety, post-traumatic stress disorder, and oppositional defiant disorder; and that he had been treated for mental illness in the past at a hospital and several counseling centers.

On the basis of the petition and supporting medical records, the superior court ordered that Connor be transported to Alaska Psychiatric Institute (API) for an evaluation. A few days later API filed a petition for 30-day commitment and a petition

---

[1] We use a pseudonym to protect the respondent's privacy.

for approval to administer medication without Connor's consent. The commitment petition again described Connor's delusions and paranoia and alleged that he was gravely disabled as a result of mental illness. The medication petition alleged that Connor was incapable of giving or withholding informed consent to the administration of a necessary psychotropic drug.

## B. Proceedings Before The Master

The Public Defender Agency was appointed to represent Connor at the hearing, and his lawyer and the State stipulated to a one-day continuance to "allow consultation." The hearing was held on August 10, 2017, before a standing master. Also present at the start of the hearing were the State's attorney, Connor's attorney, and the State's witness, Gerald Martone, a psychiatric nurse practitioner who treated Connor at API. Connor was not present, but Martone told the master that he would be coming. Someone — apparently Connor's attorney — responded, "Oh, he wants . . . he wants to come down? Okay." The master addressed a few preliminary matters, after which Martone said, "Can I just call and find out what . . ."; and the State's attorney completed the thought: "what the status is? Sure." When Martone returned, he reported, "He has declined to . . . "; and Connor's attorney responded, "All right, that was my understanding."

The master then stated, "As I understand it, the patient has declined to be present at the hearing." Neither party objected or otherwise challenged this statement, and the hearing proceeded. It was interrupted partway through when Connor called the courtroom on the telephone. The master gave Connor's counsel "a break . . . to speak with him." When the hearing resumed, the only further mention of Connor's presence or absence was his counsel's statement near the end of the hearing that "he's not here in person."

The State called only Martone to testify in support of the petition for a 30-day commitment. Martone was qualified as an expert in the field of psychiatry and testified that he had the opportunity, as Connor's direct provider, to observe and evaluate his behavior. Martone testified that he diagnosed Connor with "unspecified psychosis" because he had "very paranoid delusions," "appear[ed] to be responding to hallucinations," was "unable to judge what is real and what is not real," at times appeared catatonic, and would get very angry and agitated without warning. He explained that Connor in the past had "plucked out all his eyebrows and eyelashes," believed one of his teeth was "a transmitter to the FBI," and had "been trying to pull his own tooth out." Martone testified that Connor remained "very paranoid and delusional," had a "fixed belief that he was in the back of the plane on September 11th and [was] culpable in the Trade Center attacks," often looked away as if reacting to hallucinations, and said "weird" and incomprehensible things.

Martone testified that he did not believe Connor could provide for himself outside the hospital setting. He testified that Connor could be treated on an outpatient basis "[i]f he took medications" but that Connor had refused to do so. He testified that he had tried to talk to Connor about outpatient treatments but had to break off the conversation and leave the room because of Connor's anger and hostility.

According to Martone, Connor would benefit from a continued stay at API because "[h]is lifetime prognosis would be greatly improved if he's assertively treated" — meaning if he was administered medication. But he also testified that Connor would improve from treatment at API even without medication because "a structured safe setting, no access to drugs, and a predictable routine would be helpful to him," clarifying that the setting and routine were "supportive" while only medication was "remedial."

The master made oral findings on the record at the close of the commitment phase of the hearing. Her first finding was that "the patient's waived his presence." No

-4- 7345

one objected, and the master did not expand on the issue. The master then found by clear and convincing evidence that Connor suffered from a mental illness — an "unspecified psychosis" — that made him gravely disabled, and that his "severe and abnormal mental disorder . . . [or] distress . . . is associated with significant impairment of judgment, reason, or behavior [which] causes a substantial deterioration of [his] previous ability to function independently." The master also found that there was "not a less restrictive placement at this time."

The proceeding then turned to the issue of the involuntary administration of medication; a court visitor and Martone both testified. The master again placed her decision on the record, finding insufficient evidence that Connor was incapable of giving informed consent. She noted, however, that because "it sounds like there was some difficulty in communicating with the patient today . . . [,] [she was] going to deny the petition for medication without prejudice," and that it might be appropriate for API to refile the petition "after the patient is really given all of the necessary information about the risks [and] benefits of the medication."

## C. Superior Court Orders

The master issued written proposed orders consistent with her oral findings, recommending that the superior court grant the petition for 30-day commitment and deny the medication petition. The written order also made a finding that Connor's "assaultive conduct toward Mr. Martone" made it likely that he would "cause serious harm to others," and it made that finding one of the bases for commitment. The superior court signed the proposed orders without modification. In a subsequent order, however, "[a]fter reviewing the whole hearing," the court expanded on its reasoning and specifically addressed written objections Connor had made to the master's oral findings

on the 30-day commitment. Citing *In re Hospitalization of Stephen O.*,[2] the court first concluded that the State had proved by clear and convincing evidence that Connor was gravely disabled because he "could not live safely outside of a controlled environment, and had a condition of mental illness that, if left untreated, would cause him to suffer significant impairment of judgment, reason, or behavior." The court noted that the master was not able to personally observe Connor because he waived his presence, citing Connor's statutory right to remain silent under AS 47.30.735(b)(8). The court stated that it would "not adopt" the finding that Connor was a danger to himself or others, because the State had not alleged that as a basis for its petition. Finally, the court concluded that there were no less restrictive treatment alternatives to hospitalization, relying on Martone's testimony that Connor's psychosis would improve even without medication if he was "provided a structured setting, no access to drugs[,] and a routine." The court found that the Brother Francis Shelter was Connor's only alternative for shelter because he was barred from returning to Covenant House and that placement at the Brother Francis Shelter would "not provide the structured, drug[-]free[,] and routine environment necessary to help [Connor]."

Connor appeals. He challenges the finding that he waived his statutory right to be present at the commitment hearing, the finding that there was no less restrictive alternative to hospitalization, and the court's failure to amend the commitment order to correctly reflect its later rejection of the "harm to himself or others" finding.

## III. STANDARD OF REVIEW

" 'Factual findings in involuntary commitment or medication proceedings are reviewed for clear error,' and we reverse those findings only if we have a 'definite

---

[2]    314 P.3d 1185, 1195 (Alaska 2013).

and firm conviction that a mistake has been made.' "[3] "Whether those findings meet the involuntary commitment and medication statutory requirements is a question of law we review de novo."[4]

We review issues raised for the first time on appeal for plain error.[5]

## IV.   DISCUSSION

### A.   It Was Not Plain Error To Find That Connor Waived His Right To Be Present At The Commitment Hearing.

By statute, a person who is the subject of a petition for an involuntary 30-day commitment has the right to be present at the commitment hearing.[6]  The statute further provides:

> [T]his right may be waived only with the respondent's informed consent; if the respondent is incapable of giving informed consent, the respondent may be excluded from the hearing only if the court, after hearing, finds that the incapacity exists and that there is a substantial likelihood that the respondent's presence at the hearing would be severely injurious to the respondent's mental or physical health.[7]

The master found that Connor waived his right to attend the hearing based apparently on the representation of Connor's counsel that that is what her client wanted. But the master made no findings about whether the waiver was based on "informed consent." Connor contends this was error: that the superior court should have inquired

---

[3]   *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007)).

[4]   *Id.* at 764.

[5]   *Wetherhorn*, 156 P.3d at 379.

[6]   AS 47.30.735(b)(1).

[7]   *Id.*

into, and made findings about, the basis for Connor's apparent waiver. We do not need to decide whether this was error, but we assume it was for purposes of the following discussion.

Connor observes correctly that we subject the waiver issue to "plain error" review because he did not object at the time. "A plain error involves an 'obvious mistake' that is 'obviously prejudicial.' "[8] Connor contends that both prongs of the plain error test are met. He asserts that the mistake was obvious because the wording of AS 47.30.735 is clear and yet the court made no inquiry into the basis for his waiver. And he asserts that the "obvious prejudice" prong is met because if he had been present "he would have had the opportunity to assist his attorney in challenging the petition, either in providing information that might have helped his attorney present evidence or cross-examine Martone or — more importantly — through the opportunity to testify on his behalf," which may "have resulted in a different outcome."

But we cannot conclude that the assumed error was either obvious or obviously prejudicial. We have not had occasion to explore the requirements of AS 47.30.735(b)(1), nor have we delineated a procedure for complying with it.[9] The statute itself requires the court to make specific findings about the respondent's incapacity "if the respondent is incapable of giving informed consent,"[10] but it does not

---

[8] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[9] *Cf. Lee v. State*, 509 P.2d 1088, 1092 (Alaska 1973) (holding that attorney may effectively waive client's right to be present in noncapital criminal case if "(1) the defendant has given counsel express authority in a knowing and intelligent manner, (2) the defendant is present at the time of the waiver, has clearly been informed of his rights, and remains silent, or (3) the defendant subsequently acquiesces in the proceedings in a knowing and intelligent manner").

[10] AS 47.30.735(b)(1).

tell the court what to do if the respondent *is* capable of giving informed consent. Here, with regard to the administration of medication, the master concluded that the evidence did not support a finding that Connor was "[in]capable of giving informed consent"; the superior court adopted this finding, and neither party appealed it. Although Connor appears to argue on appeal that the court should have made findings about his capability, he notably does not argue that an inquiry would have reached a different conclusion with regard to waiving his presence than it did with regard to consenting to medication.

While the statute's requirement of "informed consent" is indeed clear, a court in most civil contexts may justifiably assume that a lawyer who waives a client's right has the client's informed consent to do so.[11] This assumption arises in part from attorneys' professional duties. Rule 1.4(a) of the Alaska Rules of Professional Conduct requires an attorney to "explain a matter [to the client] to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 1.4(b) requires more specifically that the attorney "promptly inform the client of any decision or circumstance that requires the client's informed consent" and "refrain from taking binding action on the matter" until informed consent has been given. Courts

---

[11]     *See In re Conservatorship of John L.*, 225 P.3d 554, 569 (Cal. 2010) ("[I]n the absence of any contrary indication, the superior court may assume that an attorney is competent and fully communicates with the [respondent] about the entire proceeding."); *Sun Country Sav. Bank of N.M., F.S.B. v. McDowell*, 775 P.2d 730, 734 (N.M. 1989) ("The authority of an attorney to enter an appearance, receive notice, and to act on behalf of the client at hearings may be inferred by the court from the actions of the attorney" but "may be dispelled by evidence that the acts of the attorney were not in fact authorized by the client . . . ."); *cf. Haziel v. United States*, 404 F.2d 1275, 1278 (D.C. Cir. 1968) (observing that in criminal context, "the client may be bound by his counsel's calculated decision when trial tactics are involved," whereas "[i]n other circumstances we rely upon counsel to speak for his client not because we believe the attorney must make the decision, but because we assume the attorney has consulted with his client, advised him of what is at stake, and helped him toward a wise decision").

may generally assume that attorneys are aware of and complying with these professional duties, absent evidence to the contrary.[12]

Here, the master was not made aware of any "evidence to the contrary." Connor does not point to anything in the record suggesting that his counsel did *not* comply with her professional duties; rather, the record supports the conclusion that she consulted with Connor about the issues pertinent to the hearing and that he made an informed decision to waive his presence. The hearing was continued for a day to "allow consultation," which is not otherwise explained but reasonably implies an attorney-client meeting about the impending proceedings. At the outset of the next day's hearing, the audio record appears to show Connor's counsel's surprise that her client "want[ed] to come" to the hearing, given her "understanding" that he did not wish to be present. The master was there to observe counsel's reaction to this news. When the master noted later that Connor had "declined to be present at the hearing," his counsel did not object, question her client's capability of giving informed consent, or otherwise challenge the master's understanding. The hearing proceeded in Connor's absence until it was interrupted by his telephone call, and the court recessed to allow him another opportunity to consult with his attorney. The hearing then resumed, again in Connor's absence and again without objection. And when the master made an essential finding of fact at the close of the commitment hearing that Connor had "waived his presence," his counsel again raised no objection and made no request for further findings about her client's capability.

---

[12]     *See, e.g.*, *State ex rel. Means v. King*, 520 S.E.2d 875, 883 (W.Va. 1999) ("We presume . . . that lawyers will follow the ethical tenets of our profession."); *Henderson v. State*, 708 So. 2d 642, 644-45 (Fla. Dist. App. 1998) ("We presume attorneys will follow the rules of professional conduct" with regard to discovery obligations in criminal cases.).

Given this factual setting, the attorney's duties to her client, the express statutory requirement of a factual inquiry "if the respondent is incapable of giving informed consent," and the absence of statutory language or case law requiring a specific inquiry if the respondent *is* capable of giving informed consent, we conclude that the assumed error in this case was not obvious for purposes of the plain error test.

Nor can we conclude that the assumed error was obviously prejudicial. Connor asserts that if he had been present he may have been able to assist his attorney with her presentation of evidence or the cross-examination of Martone, or he may have testified himself, and that this may have affected the hearing's outcome. But Connor notably does not assert that he *wanted* to be present at the hearing. And the error alleged is not that he was wrongly excluded, but rather that the master failed to inquire into whether he waived his presence with informed consent; Connor does not suggest what such an inquiry would have uncovered. He notably does not allege that it would have resulted in a finding that he lacked the capability to give informed consent (the opposite of what he argued successfully in the medication phase of the hearing).

In *Remy M. v. State, Department of Health & Social Services, Office of Children's Services*, we declined to adopt a rule that the trial court in a child in need of aid case must directly address the parent to determine whether he or she wishes to testify before allowing that right to be waived by the parent's attorney.[13] We held that the parent had "not even made the threshold allegation that he wished to testify and that his attorney 'unlawfully usurped [his] decision,' " and thus, "even if [the parent] had the same right as a criminal defendant to make the final decision whether to testify, he [had]

---

[13]    356 P.3d 285, 288-89 (Alaska 2015).

not established any violation of that right."[14] Here, similarly, Connor has not even made the "threshold allegation" that he wished to be present and that the master's ruling — that he had waived his presence — was contrary to his wishes. While Connor argues that this case is distinguishable from *Remy M.* because, unlike the parent in *Remy M.*, he is simply arguing for the enforcement of a statutory process, this argument overlooks the nature of plain error review, where obvious prejudice is a necessary prong.[15] Connor cannot establish obvious prejudice if he does not even allege that an inquiry into his capability would have made a difference to the proceedings.

We conclude that, assuming it was error not to inquire further about Connor's capability in the context of his waiver of his presence at the hearing, it was not plain error requiring reversal of the 30-day commitment order.

B. **The Superior Court Did Not Err In Finding By Clear And Convincing Evidence That No Less Restrictive Placement Alternatives Were Available.**

In a proceeding for a 30-day commitment order, "a petitioner must prove, by clear and convincing evidence, the petition's allegation that there are no less restrictive alternatives."[16] "Finding that no less restrictive alternative exists is a constitutional prerequisite to involuntary hospitalization."[17] The "least restrictive alternative" is the one that is "no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient" and "involve[s] no restrictions on physical movement nor supervised residence or inpatient care except as reasonably

---

[14] *Id.* at 289 (quoting *LaVigne v. State*, 812 P.2d 217, 220 (Alaska 1991)).

[15] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[16] *In re Hospitalization of Mark V.*, 375 P.3d 51, 58 (Alaska 2016).

[17] *Id.* at 59.

necessary for the administration of treatment or the protection of the patient or others from physical injury."[18]

At Connor's hearing, the master found there was no "less restrictive placement [than API] at this time," and the superior court adopted the master's explanation that Connor "had been staying at Covenant House but [was] not welcome back there" because of his "anger and violence." The court expanded on this two weeks later in its order on Connor's objections. It found, based on Martone's testimony, that Connor's "psychosis will improve if he is provided a structured setting, no access to drugs[,] and a routine." It found that because Connor could not return to the Covenant House, his only alternative for housing outside of API was the Brother Francis Shelter, which would "not provide the structured, drug[-]free[,] and routine environment necessary to help [Connor]."

Connor argues that these findings were inadequate. He observes that the initial petition to have him evaluated by API recited his earlier outpatient treatment at a hospital and two mental health counseling centers, but at the hearing API presented no evidence that it had contacted these other providers "to learn what the course of [outpatient] treatment had been or how compliant or consistent Connor was with treatment[,] or to determine whether any of these providers would be willing to provide treatment to Connor." Connor also contends that the record does not support a finding that he needed to be confined: "According to Martone, the only treatment that would be beneficial to Connor was medication, regardless of whether he was in a residential treatment program or an outpatient treatment program," and Connor "could be treated on an outpatient basis" as long as he was "willing to take medication." And Connor argues that because the court ultimately found that he could not be medicated

---

[18]    AS 47.30.915(11).

involuntarily, the only benefits Connor could possibly receive from confinement at API were, in Martone's words, "a structured safe setting, no access to drugs, and a predictable routine," benefits that do not directly address Connor's mental illness and are not sufficient to justify involuntary confinement.

We conclude, however, that the "least restrictive alternative" finding is supported by clear and convincing evidence. The court found that Connor was "gravely disabled": this finding itself presupposes an inability to "live safely outside of a controlled environment."[19] Connor does not challenge the "gravely disabled" finding on appeal, and it has significant support in Martone's testimony. Martone testified that he "doubt[ed] [Connor] would be able to negotiate getting food on his own" or otherwise provide for himself outside of the hospital, and he agreed that Connor was "not able to safely survive if released to the community at this time," in part because he was barred from returning to Covenant House "because of his violence." Martone's descriptions of Connor as hallucinating, volatile, and sometimes catatonic support his opinion that Connor could not live safely on his own. While Martone also agreed that Connor seemed able to take care of some of his basic needs, "we will not reweigh [the] evidence

---

**19**     *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1195 (Alaska 2013); *see also* AS 47.30.915(9)(B) (defining "gravely disabled" as "a condition in which a person as a result of mental illness . . . will, if not treated, suffer or continue to suffer severe . . . distress . . . associated with significant impairment of judgment, reason, or behavior causing a *substantial deterioration of the person's previous ability to function independently*") (emphasis added); AS 47.30.915(9)(A) (defining "gravely disabled" as "a condition in which a person as a result of mental illness . . . is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable *if care by another is not taken*") (emphasis added).

if the record supports the court's finding," which it does.[20]

Martone also testified that hospitalization was the least restrictive alternative available. He testified that Connor could improve as an outpatient, but only "[i]f he took medications," and that Connor had refused medication on an outpatient basis and was currently refusing it at API.

As Connor correctly points out, Martone's testimony in favor of hospitalization was premised largely on his expectation that Connor could be "assertively treated" at API with medication against his will, which the court ultimately refused to allow. But there was no evidence that Connor's treatment objectives could be achieved anywhere else, including Covenant House and the Brother Francis Shelter. And API at least afforded Connor the "structured[,] safe setting, [with] no access to drugs, and a predictable routine" that Martone testified would be "helpful" and "supportive" while protecting him from harm.[21] Martone also testified that he would continue to offer Connor medications "every night." When, as here, there appear to be no good options that will both "achieve the [patient's] treatment objectives" and protect him "from physical injury,"[22] the least restrictive alternative may be the one that at least keeps the patient safe while his providers attempt treatment.

Martone's failure to contact Connor's previous outpatient providers (other than Covenant House) does not alter our conclusion. Martone believed medication to be

---

[20]     *In re Hospitalization of Jacob S.*, 384 P.3d 758, 766 (Alaska 2016).

[21]     *Cf. Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 186 (Alaska 2009) (describing "the state's *parens patriae* power" as "the 'inherent power and authority of the state to protect "the person and property" of an individual who "lack[s] legal age or capacity" ' " (alterations in original) (quoting *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 249 (Alaska 2006))).

[22]     *See* AS 47.30.915(11)(A)-(B).

the only "remedial" approach to Connor's psychosis, and he testified that he had talked to Connor about taking medication on an outpatient basis and Connor refused to consider it. The court was entitled to rely on Martone's expert opinion that outpatient services — regardless of their identity and regardless of whether they had treated Connor before — were not a realistic option.

In *In re Hospitalization of Mark V.*,[23] we affirmed a finding that there were no less restrictive alternatives to hospitalization. The respondent argued that the superior court erred in finding that he was unable to fend for himself because the court "failed to account for his family support and thus required him to function successfully alone."[24] But we concluded that the finding was supported by testimony about the respondent's need for medication and his unwillingness to follow an outpatient regimen.[25]

In *In re Hospitalization of Joan K.*,[26] we affirmed a finding that there were no less restrictive alternatives that would adequately protect both the respondent and the public. The respondent argued that the superior court erred by ruling out outpatient treatment or a home placement even though the testifying physician did not contact the family or prior psychiatrist to ask about the respondent's potential for success in these alternative settings.[27] We noted witnesses' testimony that the respondent needed reliably administered medication to bring her manic symptoms under control; that constant surveillance and care were necessary to ensure the success of this regimen; and that the

---

[23]     375 P.3d 51, 59-60 (Alaska 2016).

[24]     *Id.* at 59.

[25]     *Id.* at 60.

[26]     273 P.3d 594, 601-02 (Alaska 2012).

[27]     *Id.* at 601.

respondent's "changeable emotions" and "lack of insight" into her own behavior made it " 'very unlikely' [that] she would follow through with outpatient treatment even if she said she would."[28]

We recognize the difference between these two cases and this one. Unlike the respondents in *In re Mark V.* and *In re Joan K.*, Connor was refusing medication at API, and thus hospitalization did not guarantee that he would receive the remedial treatment Martone considered necessary to his recovery. But as in *In re Mark V.* and *In re Joan K.*, the evidence here supports the court's finding that the hospital provided structure and safety, at least temporarily, along with the possibility of improvement he could not get elsewhere. That finding is supported by clear and convincing evidence.

C.     **The Commitment Order Should Be Corrected To Omit The Finding The Trial Court Ultimately Rejected.**

Finally, Connor challenges the finding — first made by the master and then adopted by the superior court when it signed the proposed orders — that he was "likely to cause serious harm to others." Connor objected to this finding on the ground that it was not included in the commitment petition as a basis for a finding of mental illness and he thus had no notice that he was required to defend against it. The State agreed with Connor on this point, and the superior court, in deciding Connor's objections, stated that it would "not rely upon this finding in its decision." But the court did not correct the 30-day commitment order under which Connor had been hospitalized. On appeal the State argues that the superior court's decision on Connor's objections makes clear its intent to disregard this finding, but the State "does not object to [this court] remanding for a more explicit correction of this aspect of Connor's commitment order."

---

[28]     *Id.* at 602.

We agree with Connor that the proper course is for the superior court to correct the "harm to others" finding by issuing an amended 30-day commitment order.[29] We remand for that limited purpose.

## V.    CONCLUSION

The case is REMANDED to the superior court for the limited purpose of amending the 30-day commitment order to omit the mistaken finding of fact.  In all other respects we AFFIRM the judgment of the superior court.

---

[29]    *See Keturi v. Keturi*, 84 P.3d 408, 415 n.16 (Alaska 2004) (remanding in child support case for limited purpose of correcting mistake in father's income identified by this court on appeal).

# In the Supreme Court of the State of Alaska

In the Matter of the Necessity for the    )
Hospitalization of                        )        Supreme Court No. **S-16847**
                                          )
CONNOR J.                                 )             **Order**
                                          )        **Withdraw an Opinion**
                                          )
                                          )
                                          )        Date of Order: **03/22/2019**
_____       )
Trial Court Case # **3AN-17-02075 PR**

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

**IT IS ORDERED, SUA SPONTE**:

1.    Opinion No. 7329, issued on January 18, 2019, is **WITHDRAWN** and Opinion No. 7345 is issued in its place.

2.    References to the standard of review have been modified on pages 12, 14, and 17.

Entered by direction of the court.

Clerk of the Appellate Courts

/s/

_____

Meredith Montgomery

cc:    Supreme Court Justices
       Judge Herman Walker
       Publishers

**Distribution:**

_____ Megan R. Webb                     Laura Fox
        Alaska Public Defender Agency     Assistant Attorney General
        900 W. 5th Avenue, Suite 200      1031 W. 4th Avenue, Suite 200
        Anchorage, AK 99501               Anchorage, AK 99501