*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) Supreme Court No. S-18572 |
| K.B. | ) ) Superior Court No. 3AN-19-01097 PR ) ) O P I N I O N ) ) No. 7704 – July 12, 2024 ) ) ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Ian Wheeles, Judge.

Appearances: Megan R. Webb, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for K.B. Laura Wolff, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee State of Alaska.

Before: Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices. [Carney, Justice, not participating.]

MAASSEN, Chief Justice.

## I.    INTRODUCTION

A respondent in an involuntary mental health commitment proceeding repeatedly expressed dissatisfaction with his assigned attorney, primarily over the issue of whether there would be a bench trial or a jury trial. Each time, the attorney consulted

with his client and assured the superior court that the case could proceed. Following a bench trial — the respondent's preference — the court granted the commitment petition.

The respondent contends that the court erred by failing to conduct a representation hearing, or at least to inquire into whether one was necessary, given the information it had about the respondent's dissatisfaction with his appointed counsel. We conclude, however, that the circumstances surrounding the respondent's reported dissatisfaction, viewed objectively, do not support a conclusion that the attorney-client relationship had deteriorated to the extent that the attorney was incapable of effective communication with his client or objective decision-making, and the court was therefore not required to delve further into the relationship. We affirm the court's grant of the commitment petition.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

K.B. has been a patient at Alaska Psychiatric Institute (API) under successive 90- and 180-day involuntary commitment orders since 2019. The API hospitalization at issue in this appeal is K.B.'s 32nd.

K.B. has been diagnosed with schizoaffective disorder (bipolar type), antisocial personality disorder, and traumatic brain injury. According to Dr. Anthony Blanford, his attending psychiatrist, K.B. is usually unable to maintain a conversation for more than ten minutes before he ends it or veers into delusions. Other consequences of his mental illness have included violent outbursts and the destruction of property, which API reports has resulted in K.B.'s banishment from area shelters and hotels.

K.B. has participated in a number of the hearings and trials associated with his many commitments, but he has often left the proceedings after a short time.

**B.    Proceedings**

In September 2022 Dr. Blanford filed another 180-day commitment petition. At a subsequent status hearing K.B.'s then-attorney informed the court that K.B. had requested a jury for his commitment trial, set for late September.

Court convened the morning of September 28 with K.B. present. The State's attorney informed the court that the night before, at API, K.B. had told Dr. Blanford that he did not want a jury trial and wanted to "su[e] the State." The public defender who had taken over K.B.'s representation explained that his client "briefly mentioned a lawsuit," but the attorney "explained to [K.B.] that today [was] jury selection for a jury trial tomorrow" and they could "talk about any lawsuit after the jury trial." The attorney turned to K.B. for confirmation, and K.B. said, "Sounds good, Your Honor."

After jury selection began, K.B. interjected, asking, "Who dictates what kind of trial it was? I requested a judge trial. And is that something that [Dr. Blanford] requested, a jury trial?" The court asked defense counsel if he wanted to consult with his client, and defense counsel apparently did briefly before answering, "I think we're okay, Your Honor."

The next day, however, defense counsel advised the court, "[K.B.] . . . informed me that I was not listening to him, that he did not in fact want a jury trial, he wanted a bench trial, that I was fired, and that I should handle this without him." Defense counsel expressed uncertainty about how to proceed, to which the court responded:

> Do you want to recess to consider your options? I mean, to be quite frank, the statements and information from [K.B.] directly only kind of fit in with the narrative of why we're here in the first place. I don't know that I necessarily should or can take his word alone or — you know, I accept your representation of course for how he wants to proceed. And

you're still his counsel as of now. So whether there's a withdrawal or substitution is a totally different question. But I'd give you time to think on that, or if you want to proceed then, or think that that's appropriate, I can listen to that too.

Defense counsel responded, "I guess my inclination would be to proceed at this point . . . . [T]he remaining question is, you know, do we want to conduct this as a jury trial or as a bench trial." When the court asked the State's attorney whether he had any input, he replied, "[K.B.] mentioned that [I] should handle it. I'm not totally sure what that means . . . . I agree it seemed clear that he wanted a bench trial." Defense counsel then took up the court's earlier suggestion that he find K.B., who had left the courtroom, and clarify whether he wanted a bench or a jury trial. On his return defense counsel reported, "I think we should proceed with a bench trial at this point . . . . I discussed it with [K.B.]. He was very clear that that's how he wanted to proceed."

The court then dismissed the jury and proceeded with a bench trial. The court accepted defense counsel's representation that K.B.'s voluntary departure was intended as a waiver of his rights to be present and to testify. After hearing testimony from Dr. Blanford and a social worker, the court found that although K.B.'s condition had improved at API, he was still gravely disabled and likely to cause serious harm to others. The court therefore granted the petition for another 180-day commitment.

K.B. appeals this order. His sole argument on appeal is that the court erred by failing to hold a representation hearing once it learned that K.B. was dissatisfied with his attorney.

III.  **STANDARD OF REVIEW**

K.B.'s argument on appeal rests on the right to counsel, which is statutorily guaranteed in involuntary commitment proceedings[1] and protected by the

---

[1]     AS 47.30.725(d).

Alaska Constitution's due process clause.[2]  Whether that right includes a duty to inquire into K.B.'s representation under the undisputed facts of this case would ordinarily be a question of statutory and constitutional interpretation, subject to de novo review.[3]  But the State contends that K.B. did not preserve his right-to-counsel argument by raising it in the superior court and that we can therefore only review it for plain error — "an 'obvious mistake' that is 'obviously prejudicial.' "[4]

The relevant question for purposes of issue preservation is whether "[t]he trial court was made aware of the alleged error."[5]  The record supports K.B.'s contention that the court was aware of his dissatisfaction with his appointed counsel, culminating in his attempted "firing" of the public defender; that the court knew that the main cause of the dissatisfaction was the significant issue of whether there would be a bench or a jury trial; that the court understood that K.B. was raising a representation challenge; and that K.B.'s counsel was looking to the court for direction on how to proceed.  We conclude that the issue was adequately preserved for purposes of our de novo review.

---

[2]  *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 383 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[3]  *In re Hospitalization of Linda M.*, 440 P.3d 168, 171 (Alaska 2019); *Kyle S. v. State, Dep't of Health & Soc. Servs., Off. of Child's Servs.*, 309 P.3d 1262, 1267 (Alaska 2013); Alaska Const. art. 1, § 7.  While the existence and character of the duty of inquiry present questions of law, the appropriate action when that duty is triggered is heavily context-dependent.  The substance of the inquiry itself would be reviewed for an abuse of discretion, *see Walsh v. State*, 134 P.3d 366, 371 (Alaska App. 2006); we do not reach that stage of review in this case.

[4]  *In re Hospitalization of Carl S.*, 510 P.3d 486, 491 (Alaska 2022) (quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014)).

[5]  *Jordan v. State*, 420 P.3d 1143, 1152 (Alaska 2018).

## IV. DISCUSSION

### A. When The Right To Counsel Is Imperiled, Courts Have A Duty To Inquire Into A Party's Representation.

Respondents in involuntary commitment proceedings have a right to counsel.[6] This right does not allow an indigent party to choose or replace appointed counsel, nor is there even a guarantee of a "meaningful" attorney-client relationship.[7] But indigent defendants' right to counsel does require the substitution of counsel for good cause;[8] "good cause" may include "a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict."[9] The failure to replace counsel in such circumstances deprives a defendant of effective assistance, presumptively violating the right to counsel.[10]

Trial judges must therefore inquire into the causes of an indigent party's dissatisfaction when that party asks for new counsel and the apparent grounds for the request are credible.[11] Two Alaska court of appeals judges have articulated the relevant

---

[6]     *Wetherhorn*, 156 P.3d at 383-84; AS 47.30.725(d).

[7]     *Mute v. State*, 954 P.2d 1384, 1385 (Alaska App. 1998) (quoting *Monroe v. State*, 752 P.2d 1017, 1020 (Alaska App. 1988)).

[8]     *See, e.g.*, *United States v. Allen*, 789 F.2d 90, 92 (1st Cir. 1986).

[9]     *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972).

[10]     *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (quoting *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970)).

[11]     *See Brown v. United States*, 264 F.2d 363, 368-69 (D.C. Cir. 1959) (Burger, J., concurring in part) (explaining that if an indigent party's objection to appointed counsel is prima facie valid the trial court has a duty to inquire further into that party's dissatisfaction with counsel, but "[i]f no reasons are stated, the court then has a duty to inquire into the basis for the client's objection to counsel and should withhold a ruling until reasons are made known"); *United States v. Welty*, 674 F.2d 185, 187 (3d Cir. 1982) ("When a defendant requests a substitution of counsel . . . the district

considerations in concurrences to unpublished decisions. In *Blair v. State*, Judge Harbison, concurring, wrote that "in order to protect the defendant's right to counsel, a trial court generally has an affirmative duty to conduct an inquiry into the defendant's allegations" of a breakdown in the attorney-client relationship or ineffective assistance.[12] Judge Harbison endorsed "an on-the-record inquiry into the reasons the defendant seeks substitution."[13] But "the timing and scope of the inquiry will depend on the circumstances of the defendant's request for substitution of counsel and the nature of the allegations offered in support of the request."[14] Furthermore, these inquiries must be done cautiously, a principle that the court of appeals had emphasized earlier in *Mute v. State*.[15] Caution is required because "an inquiry that is conducted

---

court must engage in at least some inquiry as to the reason for the defendant's dissatisfaction with his existing attorney."); *United States v. Prochilo*, 187 F.3d 221, 229 (1st Cir. 1999) (setting aside conviction because the trial court did not adequately inquire into the reasons for the defendant's dissatisfaction with his appointed counsel); *State v. Kazee*, 432 N.W.2d 93, 96 (Wis. 1988) (holding that trial court abused its discretion when it failed to inquire into the factual basis for a criminal defendant's dissatisfaction with his attorney); *State v. Robinson*, 631 A.2d 288, 297-98 (Conn. 1993) (holding that when "a defendant voices a seemingly substantial complaint about counsel, the court should inquire into the reasons for dissatisfaction" (internal quotations omitted) (quoting *McKee v. Harris*, 649 F.2d 927, 933 (2d Cir. 1981)).

[12] *Blair v. State*, No. A-13186, 2023 WL 234326, at *11-12 (Alaska App. Jan. 18, 2023), *as amended on reh'g* (Apr. 5, 2023) (Harbison, J., concurring).

[13] *Id.* at *12.

[14] *Id.* One relevant circumstance may be the timing of the request. *See Walsh v. State*, 134 P.3d 366, 370 (Alaska App. 2006) (noting that "[t]here is substantial authority holding that a defendant's request to replace an attorney is untimely if it is made just before or during trial" but that the court of appeals has "never been asked to adopt or reject this line of cases" and in fact has considered substitution requests "made on the eve of trial").

[15] *Blair*, 2023 WL 234326, at *12 (citing *Mute v. State*, 954 P.2d 1384, 1385-86 (Alaska App. 1998)) (Harbison, J., concucurring).

carelessly, or that gratuitously probes into the attorney-client relationship, may result in the unnecessary disclosure of privileged communications, lawyer work product, or trial strategy."[16]

Judge Mannheimer, concurring in *Gardner v. State*, also emphasized the caution with which trial judges should proceed when considering whether to "inject[] themselves as referees in an attorney-client relationship."[17] But "[n]evertheless, a defendant . . . is entitled to relief if relations between attorney and client have deteriorated to the point where the attorney is incapable of effective communication with the client, or incapable of objective decision-making about the case."[18] The trial court has "an independent duty to look into the problem" if the relationship has "deteriorated to that point."[19]

We agree with these descriptions of the relevant duty. When an indigent party represented by appointed counsel requests a new lawyer, or when (as here) such a request can be reasonably inferred from the circumstances, the trial court must assess whether the party's complaint would support a conclusion that "relations between attorney and client have deteriorated to the point where the attorney is incapable of effective communication with the client, or incapable of objective decision-making about the case."[20] The court's assessment of the complaint should be based on an

---

[16]    *Id.*; *see also Walsh*, 134 P.3d at 370-71.

[17]    *Gardner v. State*, No. A-8881, 2006 WL 829758, at *5 (Alaska App. Mar. 29, 2006) (Mannheimer, J., concurring).

[18]    *Id.*

[19]    *Id.*

[20]    *Id.* We do not imply that a trial court must interrupt proceedings and make a new inquiry every time a complaint, once decided, is renewed. *See State v. Robinson*, 631 A.2d 288, 297 (Conn. 1993) (holding that once a trial court had adequately inquired

objective view of the circumstances, not solely the subjective opinions of the client or the attorney as to whether the relationship has broken down.[21] If a breakdown is evident, the trial court has a duty to inquire further, exercising appropriate caution so as to avoid "unnecessary disclosure of privileged communications, lawyer work product, or trial strategy."[22]

**B.      K.B.'s Complaints, Viewed Objectively, Did Not Trigger The Court's Duty To Inquire Further Into The Attorney-Client Relationship.**

Under the circumstances of this case, we conclude that the trial court was not obligated to inquire further into the attorney-client relationship. K.B. argues that the apparent inability to settle the question of whether he would have a jury or a bench trial, culminating in his attempted "firing" of his attorney, should have triggered the duty to inquire. The three caution flags in the progression of his complaint are: (1) his request for a bench trial, reportedly made to Dr. Blanford the night before the first day of trial and relayed to the court the next morning by the State's attorney; (2) K.B.'s question to the judge later that morning about who decides "what kind of trial it was"; and (3) defense counsel's report to the court the next day that K.B. had fired him because K.B. wanted a bench trial and the attorney "was not listening to him."[23]

---

into a defendant's dissatisfaction with counsel and ruled on the issue, it "was not thereafter required continually to halt the trial and to inquire further into the defendant's incessant complaints over his attorney's performance unless they were different and seemingly substantial").

[21]      *See Walsh*, 134 P.3d at 369.

[22]      *Blair v. State*, No. A-13186, 2023 WL 234326, at *12 (Alaska App. Jan. 18, 2023), *as amended on reh'g* (Apr. 5, 2023) (Harbison, J., concurring).

[23]      The only other substantive issue that arose during this time was K.B.'s interest in suing the State, on which his attorney demurred; this apparently did not come up again and would have been outside the scope of public defender representation in any event.

On each of these three occasions, the issue was explored with the court and apparently resolved in favor of continued representation. First, as for K.B.'s request for a bench trial relayed to the court via the State's attorney (along with K.B.'s desire to sue the State), the court immediately asked defense counsel whether he was aware of these issues and wanted to confer with K.B. The attorney responded, "[K.B.] briefly mentioned a lawsuit, but I explained to him that today we're doing jury selection for a jury trial tomorrow. And then we can talk about any lawsuit after the jury trial, I think is where we landed, correct, [K.B.]?" K.B. responded, "Sounds good, Your Honor." The court then asked defense counsel, "Do you need any more time to talk with him about what today is?" (presumably referring to the jury selection process). Defense counsel declined the opportunity as unnecessary, but the court readily agreed to counsel's request "for breaks periodically," apparently as became necessary for explaining things further to his client.

Several hours later, after the parties had discussed jury instructions and begun picking a jury, K.B. asked the court, "Who dictates what kind of a trial it was? I requested a judge trial. And is that something that [Dr. Blanford] requested, a jury trial?" The court advised him that "no, . . . the witnesses don't request the trial," but that K.B. was "going to have to talk to [defense counsel] about that." The court asked defense counsel whether he needed time to talk to his client. There followed what the transcript identifies as "Whispered conversation," after which defense counsel reported, "All right. I think we're okay, Your Honor." The court again said, "Okay. If you need a break, let me know."

Finally, on the morning of the second day of trial — with K.B. not present — defense counsel reported, "[W]hen I was attempting to describe to [K.B.] the schedule of events for today, [K.B.] informed me that I was not listening to him, that he did not in fact want a jury trial, he wanted a bench trial, that I was fired, and that I

should handle this without him." Defense counsel deferred to "the discretion of the court" as to "how to proceed at the moment." The court offered "a recess to consider [the] options," noting that the attorney was "still [K.B.'s] counsel as of now" and could take time to think about "whether there's a withdrawal or substitution" or to proceed instead. After further discussion of the jury trial right and K.B.'s possible misunderstanding of the proceedings, the court advised defense counsel, "I would probably take one more step out into the hall and try to call [K.B.] and just say hey, the court is fine proceeding with a bench trial if that's what you are sure you want, can you — I just want to ask you one more time if you had enough time to think about it."

A few minutes later defense counsel responded to the court's suggestion: "I think I'm going to take the court up on your request to make one more run at my client. He may well still be downstairs, so I'm going to go see if I can locate him downstairs." After a brief recess defense counsel returned to the courtroom and said, "Your Honor, I think we should proceed with a bench trial at this point." The court asked, "Any further comments or findings you want to have me make [in] that regard?" Defense counsel answered, "Your Honor, I discussed it with [K.B.]. He was very clear that that's how he wanted to proceed." The court excused the jury and trial proceeded as a bench trial, as K.B. had requested.

We cannot say that these circumstances, viewed objectively, demonstrate a breakdown in the attorney-client relationship such that the court had a duty to inquire further. The only relevant issue between K.B. and his counsel of which the court was aware was whether there would be a bench trial or a jury trial.[24] The court repeatedly

---

[24] Like the trial court, we do not know whether K.B. maintained a consistent position on this issue in his private discussions with counsel; the record tells us only that he raised the issue on three occasions, each occasion resulting in further attorney-client consultations followed by assurances to the court that the case could proceed.

observed defense counsel communicating with K.B. about this issue and relaying K.B.'s positions to the court, even after K.B. had purportedly "fired" the attorney for his failure to listen. In short, the record shows that the issue was ultimately resolved through attorney-client communication, resulting in the bench trial that K.B. apparently desired. These circumstances support a conclusion that defense counsel was fully capable "of effective communication with the client [and] of objective decision-making about the case,"[25] and no further inquiry into the relationship was necessary.

K.B. argues that his dissatisfaction with his lawyer was not resolved with the apparent resolution of the bench trial issue because it may have been the distrust that kept him from returning to the courtroom for trial and precluded him from testifying. He asserts that there is "nothing in the record to support the contention that counsel spoke with K.B." about anything other than the bench trial issue, and particularly no indication that defense counsel made sure that K.B. was knowingly waiving his other rights. He contends that absent assurances that there had not been a breakdown of communication affecting other issues, the superior court was required to conduct a representation hearing or a least "ask K.B. if he wanted a representation hearing."

But K.B. reverses the operative presumption. "Courts may generally assume that attorneys are aware of and complying with these professional duties [regarding attorney-client communication and informed decision-making], absent evidence to the contrary."[26] Here, the court was aware of one potentially significant attorney-client dispute and that it had been resolved to the client's satisfaction through attorney-client communication; the court was not required to assume there were others.

---

[25] *Gardner*, 2006 WL 829758, at *5 (Mannheimer, J., concurring).

[26] *In re Hospitalization of Connor J.*, 440 P.3d 159, 164 (Alaska 2019).

## V. CONCLUSION

The superior court's order granting the petition for a 180-day commitment is AFFIRMED.