NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of<br><br>K.B. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Supreme Court No. S-18731<br><br>Superior Court No. 3AN-19-01097 PR<br><br>MEMORANDUM OPINION<br>AND JUDGMENT[*]<br><br>No. 2057 – November 13, 2024 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Ian Wheeles, Judge.

Appearances: Sharon Barr, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for K.B. David A. Wilkinson, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

The superior court committed a man with an extensive history of mental illness for an eighth consecutive 180-day period based on findings that the man was both gravely disabled and likely to cause serious harm to others. The man challenges

---

[*] Entered under Alaska Appellate Rule 214.

the commitment order, arguing that the court's determinations were based on insufficient evidence. We affirm the superior court's finding that the man was gravely disabled, and therefore affirm the commitment order.

## II. FACTS AND PROCEEDINGS

### A. Facts

K.B.[1] has been hospitalized at the Alaska Psychiatric Institute (API) under successive involuntary commitment orders since 2019.[2] He was admitted to API 32 times between 2010 and 2019.

K.B. has a diagnosis of schizoaffective disorder, bipolar type, as well as antisocial personality disorder and traumatic brain injury. These conditions manifest as disorganized thoughts, irrationality, and paranoid delusions, such as beliefs that he is in the military or working for a federal intelligence agency. In particular, K.B. has a long-standing, fixed delusion that he owns many homes and has significant financial resources. These delusions can result in aggressive encounters, such as when K.B. trespasses on property owned by others under the belief that he owns it. K.B. has repeatedly assaulted others as a result of his illness, particularly when he is unmedicated or his delusions are questioned. He has been banned from assisted living facilities, hotels, and all shelters in Anchorage, as well as Alaska Behavioral Health.

K.B.'s condition has shown some improvement over his time at API. He has moved to a less restrictive unit and been allowed a community pass. But he does not want to take medication and has a history of refusing to take medication when in the community. If he is not medicated, his condition deteriorates rapidly.

---

[1] We use initials rather than a pseudonym at K.B.'s request.

[2] *See In re Necessity for the Hospitalization of K.B.*, No. S-18391, 2024 WL 113717 (Alaska Jan. 10, 2024); *In re Necessity for the Hospitalization of K.B.*, 551 P.3d 1141 (Alaska 2024).

## B. The March 2023 Commitment Hearing

API petitioned for an eighth consecutive 180-day commitment in March 2023. The petition asserted that K.B. was gravely disabled under AS 47.30.915(11)(B) and likely to cause serious harm to others under AS 47.30.915(15).[3]

A superior court master held a hearing on the petition in March 2023. A social worker testified that K.B. experienced "acute symptoms of delusional thoughts," believed he "owns various homes or that he can go out of country in the military," and was unwilling to take medication in the community. She explained that K.B. had plans, if discharged, to either leave the country on a military deployment or return to a home that he believes he owns.[4]

K.B.'s attending provider likewise testified that K.B. has expressed delusions of owning properties and having significant financial resources, as well as making statements that he is a prince and affiliated with the military. These delusions, the provider testified, would prevent K.B. from finding a less restrictive facility if released, because he would likely leave a shelter or other facility to go to the properties he believes he owns. The provider explained that these beliefs had previously led to aggressive encounters, and that K.B.'s refusal to take medication if released made it likely that this sort of violent encounter would occur again. While K.B. is able to engage in dialogue, the attending provider testified that longer conversations become "derailed," which further complicated discharge planning.

K.B.'s attending provider also testified K.B. posed a "conditional" risk to others, typically linked to situations around medications. While API staff have largely avoided violent incidents by developing a complex behavioral plan that avoids certain known triggers, K.B. did threaten an API staff member in February 2023.

---

[3] AS 47.30.915(11)(B), (15).

[4] K.B. does not own a home and is not in the military.

The provider expressed his optimism that K.B. might be discharged in the future, describing a prior "verbal agreement" for K.B. to take his medications while living in transitional housing. At the time of the hearing, however, the provider expressed his belief that K.B. would not take his medication in the community and there was no outpatient provider who could prescribe his medications.

## C.    The Involuntary Commitment Order

The superior court master recommended approval of the petition, finding by clear and convincing evidence that K.B. was incapable of surviving safely in freedom and posed a substantial risk of harm to others. In oral findings, the master explained that K.B.'s delusions made it highly unlikely K.B. would remain in a safe location or maintain himself if released into the community. He also found that K.B.'s history of assaults, along with the specific threat in February 2023, meant K.B. posed a substantial risk of harm to others. He further explained that K.B. needs to take medication to "be able to maintain himself safely in the community," and that his unwillingness to do so created risk to any person who tried to assist him with taking medication because this was "an apparent trigger."

K.B. filed written objections to the master's recommendations. The superior court overruled the objections and ordered that K.B. be committed for 180 days. The superior court first noted that it was permitted to rely on factual findings from prior hearings.[5] It then concluded, in light of K.B.'s "aggressive/assaultive" history and the specific threat he made in February 2023, that K.B. was likely to cause serious harm to others. It also concluded K.B. was gravely disabled, noting his unwillingness to take medication if discharged and the likelihood that he would "quickly decompensate and be unable to provide for his basic needs" if unmedicated.

K.B. appeals.

---

[5]    AS 47.30.770(d).

## III. STANDARD OF REVIEW

We review factual findings in an involuntary commitment proceeding for clear error.[6] Whether those findings meet the statutory standards for involuntary commitment is a question of law we review de novo.[7]

## IV. DISCUSSION

When ordering an additional 180-day involuntary commitment, the superior court must find, by clear and convincing evidence, that the respondent is mentally ill and, as a result, is either "likely to cause harm to self or others" or "gravely disabled."[8] K.B. appeals the superior court's commitment order, arguing there was insufficient evidence to support the court's findings that he was likely to cause harm to others and was gravely disabled.[9] We see no error in the grave disability determination, and therefore affirm the commitment order on that basis.[10]

A respondent is gravely disabled if, as a result of mental illness, he "is so incapacitated that [he] is incapable of surviving safely in freedom."[11] A lack of housing is insufficient, by itself, to show that an individual is incapable of surviving safely in

---

[6] *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019).

[7] *Id.* at 923-24.

[8] AS 47.30.755; *see* AS 47.30.770(b) (applying this standard to 180-day commitments).

[9] The superior court also issued a medication order. K.B. does not separately challenge this order, but asks us to vacate it if we vacate the commitment order. Because we affirm the commitment order, we deny the request to vacate the medication order.

[10] The grave disability finding is independently sufficient to affirm the commitment order. Thus we do not address the court's finding that K.B. is likely to harm others.

[11] AS 47.30.915(11)(B).

freedom.[12] But an inability to secure any form of shelter because of a mental illness supports a finding that the respondent is gravely disabled.[13] The likelihood that a respondent will discontinue medication if discharged, and the history of the respondent's behavior upon decompensation, is also relevant to the grave disability determination.[14]

The superior court concluded that K.B. was gravely disabled because he was not capable of living safely outside of API. It noted his persistent delusions about his access to money and housing, which will cause him to fail to attend to his basic needs if discharged. The court focused in particular on K.B.'s inability to meet his need for shelter, observing that he is banned from all possible shelter options and incapable of providing for his own housing because of his delusion that he owns properties where he can stay.

K.B. raises three challenges to this finding. He argues the superior court overlooked his ability to successfully meet his basic needs at API. He argues that he could be given a long-acting medication before his release. And he contends that, even if unable to secure shelter, he should be permitted to voluntarily choose to be homeless. None of K.B.'s arguments are availing.

---

[12] *See Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 378 (Alaska 2007) (explaining person cannot be committed merely because commitment is "beneficial" or in person's "best interests" (quoting *In re Detention of LaBelle*, 728 P.2d 138, 146 (Wash. 1986))), *overruled on other grounds by In re Naomi B.*, 435 P.3d at 924 (Alaska 2019).

[13] *See, e.g., In re Naomi B.*, 435 P.3d at 932.

[14] *See In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 88-89 (Alaska 2012); *In re Hospitalization of G.L.*, 449 P.3d 694, 699 (Alaska 2019) (explaining "that the superior court may consider consequences if the patient were discharged from hospitalization, including consequences of discontinuing medication").

K.B. argues that the superior court erred by disregarding evidence that he was meeting his basic needs at API. But the court's responses to K.B.'s objections show that it took this evidence into account. It simply did not find this evidence to be particularly probative of K.B.'s ability to meet his basic needs outside of API. "It is the function of the trial court, not of this court, . . . to weigh conflicting evidence."[15]

Other evidence in the record shows that K.B.'s persistent delusions would inhibit his ability to find food, clothing, and shelter outside of API.[16] K.B. experiences severe delusions about his property ownership and financial resources, and has been banned from homeless shelters, hotels, and assisted living facilities.[17] When he has previously been released, his condition rapidly deteriorated, and he returned to API looking "dirty, disheveled, and thin." Testimony at the March 2023 hearing confirmed that K.B. continues to suffer from the same delusions, which have inhibited planning for his discharge. As his provider explained, K.B.'s delusions would make it extremely difficult for him to find shelter if released, and no viable outpatient services are available to meet his needs. Thus, the superior court did not clearly err in concluding

---

[15] *Knutson v. Knutson*, 973 P.2d 596, 599-600 (Alaska 1999).

[16] The State's brief impermissibly relies on evidence, such as the log notes of prior commitment hearings, that was not admitted at the March 2023 hearing and could not have been relied upon by the superior court. These materials appear in the electronic record file because they were introduced or produced in an earlier hearing under the same trial court file number, but they are not in the record and therefore not subject to our review. We confine our review of the record to testimony from the March 2023 hearing, as well as factual findings from prior hearings.

We have repeatedly reminded the State in the context of other appeals that Alaska Appellate Rule 212(c)(1) requires all factual assertions to be supported by references to the record. If the State continues to ignore the requirements of this rule in future appeals, we will be inclined to grant a respondent's motion to direct the State to revise its brief.

[17] These factual findings from K.B.'s prior commitment hearings constitute evidence in the instant 180-day commitment proceedings under AS 47.30.770(d).

that the evidence of K.B.'s ability to meet his needs in API, an institutional setting, did not outweigh the evidence suggesting he would be unable to meet his needs after release from API.

K.B. also suggests that he could be given a long-acting medication before his release. But the superior court's analysis accounted for this possibility. While his disability "would be all the more grave once he is off his meds," the court specifically noted that K.B.'s delusions about property ownership and financial resources are present even "while he is on his medication." The court explained that its reasoning would not change even if K.B. were to be medicated upon release. And K.B.'s proposal that API could instead allow him to cycle through discharge and readmission, as has occurred on thirty-one prior occasions, is not persuasive.

Finally, K.B. argues that "people are allowed to choose to be homeless." But there is no indication that K.B. would be able to make a rational, voluntary choice to be homeless, and there is ample evidence that, as a result of his mental illness, he would be unable to find shelter.[18] K.B. is under an "ongoing delusion that he owns a residence and can simply go there upon discharge." K.B. would likely *end up* homeless or incarcerated if released, because he does not own property and has been banned from most other living facilities. But an inability to find shelter because of a mental illness is not the same as choosing to be homeless.

V. **CONCLUSION**

We AFFIRM the 180-day commitment order.

---

[18] AS 47.30.915(11)(B) (defining "gravely disabled" as "a condition in which a person as a result of mental illness . . . is so incapacitated that the person is incapable of surviving safely in freedom").